# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-06-00516-CR

**Russell J. Alligood, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 59544, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Russell J. Alligood appeals from his conviction for capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2006). After the jury found him guilty, sentence was automatically imposed at life imprisonment in the Texas Department of Criminal Justice-Institutional Division. *See id*.; Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (West 2006). In one issue on appeal, appellant contends that the trial court abused its discretion in denying his motion to sever his trial from that of a codefendant.[1] We affirm the trial court's judgment.

---

[1] Codefendant Brandon Hammock also filed a motion to sever, which was denied. Hammock's appeal is before us as cause number 03-06-00523-CR, also decided this day. *Hammock v. State*, No. 03-05-00523-CR (Tex. App.—Austin July 11, 2007, no pet. h.) (mem. op., not designated for publication). Another companion case involving codefendant Erik Siperko is pending in the Thirteenth Court of Appeals. Appellant moved to sever his case only from that of Hammock; at the hearing on the motion for severance, appellant's counsel stated that they "had no difficulty being tried with Siperko."

**Background**

In June 2005, Captain John Thresher went to check on his friend Captain Jason Gonzalez, who had not reported for work at Fort Hood that day. When Thresher arrived at Gonzalez's house in Harker Heights, he noticed that Gonzalez's pickup was gone. He looked through the glass front-door window and could see a back door standing open. When he got to the back door, he noticed muddy footprints leading into the house. He went into the house, discovered Gonzalez's dead body in the kitchen, and saw a bullet hole shot through the window. The cause of death was later determined to be four small-caliber bullet wounds to the head. Four .22-caliber shell casings were recovered from the crime scene. Among the items missing from the house were Gonzalez's military identification that had his social security number printed on it, various electronic equipment, tools, the pickup, and a flight helmet with Gonzalez's name on it.

Two of the perpetrators, Eric Siperko and appellant, were identified through video surveillance tapes in a convenience store in Killeen as they attempted to use Gonzalez's identification to cash stolen checks. Eventually, the other two perpetrators, Brandon Hammock and Matthew Harris, were identified. Each of the four gave written statements admitting participation in the crime. Investigators learned that appellant had purchased the gun, which was later discovered under the mattress in Hammock's bedroom.[2] In the shed outside Hammock's home, the officers found Gonzalez's tools and flight helmet. Hammock's fingerprint was found on the flight helmet and appellant's fingerprint was found inside a box of .22 ammunition found in Hammock's home.

---

[2] Hammock was a juvenile later certified for trial as an adult. *See* Tex. Fam. Code Ann. § 54.02 (West 2002). Hammock's father consented to the search.

Ballistics testing confirmed that the shell casings found at the crime scene had been fired by the gun recovered from Hammock's home.

Appellant, Siperko, and Hammock were tried jointly. At trial, the confessions of Siperko, Hammock, and appellant were admitted in evidence in a redacted form, eliminating all references to the codefendants. Each admitted taking part in the crime, but denied being the one who pulled the trigger. The fourth indicted conspirator, Matthew Harris, testified as an accomplice witness for the State.[3] He told the jury that in May or June of 2005, he and the other three got together and started committing car burglaries. About three days before the murder, Harris said that appellant mentioned doing some "kick doors," that is, home invasion robberies. Hammock said that they needed to be armed in case they ran into resistance. Harris, Hammock, and appellant went to a pawn shop to buy a pistol. Appellant purchased the gun, as he was the only one old enough to do so. Appellant later showed Hammock how to load and use the gun; Harris wiped it off after handling it because he had learned about fingerprints from television. On the night of the murder, all four of them met at 11:30 p.m. They dressed in dark clothing, wore gloves, and had something to cover their faces. They burglarized several vehicles and took check books.

When they returned to their car, the subject of doing a "kick door" came up again. They checked to see if they had everything they needed. Hammock displayed the gun. Appellant had a utility knife and handcuffs. Harris and Siperko had zip ties to restrain anyone who might be at home. After driving around and rejecting two or three houses, they settled on Gonzalez's. They

---

[3] At the time of trial, Harris was indicted for the same crimes and was in jail awaiting trial. He did not have a plea bargain agreement but said that he testified against the other three so he could "get this off my chest and also hopefully it might help me in the long run."

walked around the house looking for a security system; appellant cut all of the wires to the house. Hammock pointed out that he could see someone asleep in the bedroom but they decided to go ahead. Siperko and Hammock were to go directly to the bedroom and subdue Gonzalez.

Harris and appellant went to the back door and kicked it in. Harris saw Siperko and Hammock go toward the bedroom. As he and appellant entered, he heard someone yelling "get down" and then heard a shot. Harris ducked down and saw Siperko running by him with Hammock following. Hammock then stopped, pointed the gun through the window, and fired. Harris could hear groaning; Hammock fired twice more.

The group then finished the robbery and took the stolen property to Harris's residence to unload. They began writing out the checks they had taken in the car burglaries. Appellant and Harris returned to Gonzalez's residence and took the pickup and additional items. After unloading, they decided to get rid of the truck and drove it into Stillhouse Hollow Lake. Appellant and Siperko then tried to cash the checks but were unsuccessful because the checks were over the amount allowable at the check-cashing station at the convenience store. This check-cashing attempt eventually resulted in their apprehension because one of the persons from whose car the check was stolen detected the attempt to pass the check and reported it to his bank. Ultimately, the check-cashing location was identified as the 7-11 store, the surveillance tapes viewed, and the defendants identified.

At trial, the court's instructions to the jury included the law of parties. The court also instructed the jury that it was not to consider the redacted confessions of the respective codefendants against anyone other than the defendant who had signed that confession. The jury found appellant

4

and the two other defendants guilty of the offense of capital murder and the sentence was automatically imposed at life in the Texas Department of Criminal Justice Institutional Division. In one issue on appeal, appellant contends that the trial court abused its discretion in denying appellant's motion to sever his trial from that of Hammock.

**Discussion**

As a preliminary matter, the State notes that the motion to sever does not appear in the clerk's record and the State has been unable to locate a copy. However, there was a hearing on the motion to sever and the reporter's record is part of the record in the case. At the hearing on the motion, appellant contended that it should be granted because he was the oldest of the conspirators and feared that codefendant Hammock, a juvenile certified for trial as an adult, would attempt to place blame on appellant because of his age and "because of other circumstances that will come out on the witness stand in this case." In other words, he would have two opponents: Hammock and the State. He asserted antagonistic defenses existed because everyone claimed someone else actually pulled the trigger.

Two or more defendants may, at the discretion of the court, be tried jointly for any offense growing out of the same transaction unless, upon timely motion to sever, it is shown either that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant. Tex. Code Crim. Proc. Ann. art 36.09 (West 2006). Appellant argues only the second ground, contending that he and Hammock had antagonistic defenses.

The court of criminal appeals held in *Qualley v. State* that the existence of antagonistic defenses was not by itself grounds for severance. 206 S.W.3d 624, 636 (Tex. Crim.

App. 2006) (citing *Zafiro v. United States*, 506 U.S. 534 (1993); abandoning contrary language in *Goode v. State*, 740 S.W.2d 453 (Tex. Crim. App. 1987)). The court noted that the commentary to article 36.09 of the code of criminal procedure suggested that the Legislature intended for defendants accused of the same offense to be tried together most of the time. *Id*. at 631-32. After observing "prejudicial" was undefined and somewhat ambiguous, the court later said that it could not mean the types of "circumstances or disagreements between parties that would normally be expected to pop up during any trial containing multiple defendants." *Id*. The court concluded that the correct standard to establish prejudice was that "the defendant must show a serious risk that a specific trial right would be compromised by a joint trial, or that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence, and that the problem could not be adequately addressed by lesser curative measures, such as a limiting instruction." *Id*. at 636.

Mere proof of differing degrees of culpability will not support a severance; the codefendants' positions must be mutually exclusive so that if the jury believes one, it must necessarily disbelieve the other. *Davila v. State*, 4 S.W.3d 844, 847 (Tex. App.—Eastland 1999, pet. ref'd); *Gibbons v. State*, 794 S.W.2d 887, 891 (Tex. App.—Tyler 1990, no pet.). To establish inconsistent or antagonistic defenses, the defendant must show, by offer of proof or otherwise, what the defense would be if the defendant were not being tried with the codefendant. *Davila*, 4 S.W.3d at 847. The defendant has the heavy burden of showing clear prejudice from the denial of a severance. *Gibbons*, 794 S.W.2d at 891.

Appellant's fundamental complaint seems to be that a joint trial prejudiced him because, although all four defendants went into Gonzalez's house to rob him, only one fired the shots. He claims that he was unable to show his individual lack of intent to shoot because of the

6

joint trial. However, under the facts of the case, whether he personally shot or intended to shoot Gonzalez was not the controlling issue.

The court charged the jury on the law of parties, instructing the jury that if in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the coconspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in the furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out of the conspiracy.[4]

The evidence showed that all four participated in a conspiracy to commit several car burglaries that then escalated into a plan to do a "kick door." They discussed the need to obtain a gun in case someone was home and resisted; appellant purchased a gun. All four carefully prepared. They continued with the robbery despite noticing Gonzalez asleep in a bedroom. Hammock and Siperko went into Gonzalez's bedroom to subdue him, he resisted, and was shot. All four continued to loot the home and two of them even returned to take more property and Gonzalez's pickup truck. They attempted to cash stolen checks using identification stolen from Gonzalez. The proceeds of the robbery were to be split among them.

All of the defendants were involved in committing the robbery. If a group of people buys a gun to take along in case of resistance while breaking into a house, using the gun to shoot a person in the house is an offense that should have been anticipated. All four knew that Hammock had the gun with him when they went into the house. All four knew the house was occupied at that moment. Under the charge as applied to the facts, all four were culpable regardless of who the "triggerman" was. In any event, appellant's counsel argued lack of intent and differing culpable

---

[4] See Tex. Penal Code Ann. § 7.02(b) (West 2003).

7

mental states extensively, so appellant could not have been deprived of any specific right to try to demonstrate a lack of intent.

Appellant also complains that counsel for Hammock identified him as the "triggerman" to the jury. In his final argument, however, Hammock's attorney merely noted appellant's part in the scheme and stated that it could have been any one of the four conspirators who had the gun or "a player to be named later." He even stated, "Please, I'm not trying to blame Mr. Alligood." These statements do not rise to the level of an antagonistic defense, as the jury could have believed that neither appellant nor Hammock was the one who pulled the trigger; believing Hammock was not the actual shooter did not necessarily mean that they had to believe appellant was the shooter as they had at least two other choices.

### Conclusion

Appellant has not shown an abuse of discretion in the trial court's overruling of his motion to sever as he has not shown "prejudice." *See Qualley*, 206 S.W.3d at 636. Accordingly, we overrule appellant's sole point of error and affirm the judgment of the trial court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed: July 12, 2007

Do Not Publish

8